## HUMBLE OIL & REFINING CO. v. LLOYD et al.

### No. 3004.

Court of Civil Appeals of Texas. Beaumont.

July 24, 1937.

Rehearing Denied Aug. 4, 1937.

Boone, Henderson, Boone & Davis, of Corpus Christi, and Felix A. Raymer, of Houston, for appellant.

Lloyd & Lloyd, of Alice, William Mc-Craw, Atty. Gen., and H. Grady Chandler, of Austin, for appellees.

O'QUINN, Justice.

This lawsuit grew out of the following facts:

On September 6, 1907, Mucio Vela was a resident of Duval county, Tex. On that date he married Candelaria Dimas. They lived together until she died July 13, 1919. As a result of this union three children were born: Santiago, July 25, 1908; Cruz, July 16, 1910; and Jose Jesus, December 24, 1914.

Subsequent to the marriage, on June 13, 1908, Mucio Vela made application to the state of Texas, through the commissioner of the general land office, for the purchase of section 42, T. T. Railway survey, Abstract 1928, Certificate 172, covering 640 acres of land, more or less, in Duval county, Tex. The north ½ of this section is the subject-matter of the instant suit.

The section of land that Mucio Vela sought to purchase was public free school land, classed as dry grazing and mineral, and Vela's application to purchase so stated. Vela's application was granted and the land was awarded to him June 17, 1908.

He paid 1/40 of the purchase price of the land at the time of the award, as required by law. The amount of this payment was $36.16.

Carrying the classification of dry grazing and mineral land, and having been allocated to the free public school fund, all minerals under the award so made, under the law, were reserved in full to the state.

Mucio Vela and his wife, Candelaria, together with their children, lived upon the land for the required period of time, erecting sufficient improvements thereon to comply with the statutory requirements.

In 1914, however, Mucio Vela moved with his family from this land and took up his residence in Jim Wells county, Tex. At the time this change of residence occurred, Mucio Vela entered into a contract with his father, Gregorio Ruiz, and a brother, Jesus Ruiz, by the terms of which the father and brother were to live upon, farm, use, enjoy, and control the land involved, and as a consideration therefor they were to pay off and discharge, as it became due, the interest due the state on the purchase price of the land, for the use and benefit of the purchaser, said Mucio Vela. They were also to pay all taxes accruing against the land.

In due time, Mucio Vela filed his affidavit of settlement. His wife, Candelaria, died on July 13, 1919, leaving surviving her her said husband, Mucio Vela, and her three children, Santiago, Cruz, and Jose Jesus. Mucio Vela, after the death of his wife, on January 9, 1920, filed proof of his occupancy of said land and improvements as required by law, for the protection of his rights to the land. In his proof of occupancy and improvements, he made affidavit that he was still the owner of the soil.

As stated above, Mucio Vela's wife, Candelaria, died on July 13, 1919, leaving her husband and three children surviving her. Thereafter, June 7, 1922, Mucio Vela married Dionicia Gonzales in Jim Wells county, Tex., where he was then residing and where he continued to reside until November 8, 1934, at which time he and his family returned to Duval county. Prior to his return, however, on April 13, 1932, he had conveyed the land involved to J. O. Trevino of Duval county, Tex.

On February 10, 1925, Mucio Vela, joined by his wife, Dionicia Vela, and his father, Gregorio Ruiz (who was using the land for pasturage purposes under the agreement set out supra), for a valuable consideration executed and delivered to Phillip T. Wright an oil, gas, and general mining and mineral lease covering the whole of section 42, T. T. Railway Company survey, in Duval county, Tex. This lease was executed by Mucio Vela in his own behalf and as the agent of the state of Texas, in accordance with the provisions and requirements of articles 5367 and 5368, Rev.St.1925.

Subsequently Phillip T. Wright, for a valuable consideration, assigned this lease to C. W. Hahl Company; and, for a valuable consideration and by proper assignment, C. W. Hahl Company conveyed the mineral estate in the north 1/2 of said section 42 to appellant, Humble Oil & Refining Company. The north 1/2 of said section is all of the land involved on this appeal. There is no dispute as to appellant, Humble Oil & Refining Company, being vested with all the rights, title, and interest conveyed by the mineral lease from Mucio Vela and wife to Phillip T. Wright on February 10, 1925. The only issue here involved relates to the amount or proportion of the mineral estate which passed by the mineral lease referred to.

As before stated, Gregorio Ruiz, father of Mucio Vela, and Jesus Ruiz, Mucio's brother, took possession of the land (section 42) purchased by Mucio Vela from the state and involved herein. This was in 1914, and was during the life of Candelaria Vela, the first wife of Mucio. Under the agreement, Gregorio and Jesus paid for Mucio the interest installments due the state on the purchase price of the land as they became due. They also paid the taxes. This continued during the life and after the death of Candelaria. When the lease was made to Phillip T. Wright in 1925, Gregorio Ruiz was living, and by virtue of the agreement referred to between Mucio Vela and his father, Gregorio Ruiz, and his brother, Jesus Ruiz, the consideration paid therefor was delivered to Gregorio Ruiz in consideration of his using such fund as well as other rents and revenues from the land to discharge the installments of interest due on and the taxes due against the land.

Gregorio Ruiz died in 1926, but Jesus Ruiz, Mucio Vela's brother, continued the arrangements then existing and continued paying the interest installments and taxes for the use and benefit of Mucio Vela, as

the owner of the soil, until the land was conveyed by Mucio Vela to J. O. Trevino on April 13, 1932, as hereinafter stated.

At the time the lease of February 10, 1925, mentioned supra, was executed and delivered by Mucio Vela, joined by his wife (second wife), Dionicia Vela, individually and as agent of the state of Texas, there was due against the land the entire purchase price, save and except the initial payment of $36.16. There were also interest payments and taxes due.

■ Candelaria Vela, first wife of Mucio Vela, died intestate, and no administration was ever had upon her estate. The principal, interest, and taxes due were, therefore, not only charges against the land, but charges against the community estate of Candelaria and Mucio Vela; and Mucio Vela was, in law and in fact, the community survivor of such estate, and in all things acting as such.

There was nothing in the deed records of Duval county, Tex., which would give notice of the fact that Dionicia Vela (the second wife of Vela and who signed with him the lease of February 10, 1925, to Wright), was not the only wife to whom Mucio Vela had ever been married; nor was there any notice afforded by the probate record of said county, no administration having ever been instituted or had with regard to her estate. Nor do the records of the general land office at Austin give any indication of mutation or change in the marital status of Mucio Vela. All of the state's transactions were with Mucio Vela alone. His application to purchase was signed only by him. The same is true of his proof of occupancy and improvements. On August 25, 1931, Mucio Vela filed with the land commissioner his "Application for Enlargement of Sale," when he sought to take advantage of the so-called "Relinquishment Act." This application was signed alone by Mucio Vela. In fact the records of Duval county, and of the general land office all showed Mucio Vela to be the "owner of the soil," and all of his dealings with the state relative to said land were in that capacity.

As before stated, on April 13, 1932, Mucio Vela and his wife (second), Dionicia Vela, by deed of that date conveyed the land involved to J. O. Trevino. Two years later, May 14, 1934, Trevino purchased from Santiago Ruiz, Cruz Ruiz, and Jose Jesus Ruiz, the surviving children of Candelaria Vela, Mucio Vela's first wife, the interest in the land involved inherited by them from their said mother, for a consideration of $750 evidenced by a vendor's lien note in that sum, executed by said Trevino, and payable two years after date, said note provided that no personal liability should be against Trevino by reason of the note, but that said note should be paid out of the property covered by the land therein created. This note was paid before its due date—after oil had been discovered on the land.

On October 1, 1934, J. O. Trevino, in consideration of "love and affection" for his son, Humberto Trevino, conveyed to him the exact interest in the land which he had purchased from the heirs of Candelaria Vela, deceased, to wit: Santiago, Cruz, and Jose Jesus Vela. This deed was placed of record August 13, 1935. The vendor's lien note given by J. O. Trevino to the Candelaria Vela heirs by J. O. Trevino was paid by J. O. Trevino February 6, 1935, and release of said lien executed to him of that date.

On August 12, 1935, Humberto Trevino, acting for himself individually, and as agent of the state of Texas, executed a lease on the involved land to appellee E. G. Lloyd, Jr., for a consideration of 10 cents per acre, and an additional $96,000 to be paid out of a one-sixteenth of the first oil produced by the lessee from the land. The land at this time was producing large quantities of oil from wells sunk by appellant under its lease.

The lease from Humberto Trevino to appellee E. G. Lloyd, Jr., is the basis for this suit.

We have stated above the salient facts that relate to the land here involved, the north ½ of section 42, T. T. Railway survey, covering 640 acres, more or less.

Appellee E. G. Lloyd, Jr., brought this suit in the form of trespass to try title to an undivided ½ of the north ½ of said section 42, T. T. Railway survey, containing 640 acres of land, more or less, alleging that he was the owner of an oil and gas lease covering an undivided ½ of the north ½ of said section of land, and that on August 14, 1935, appellant, Humble Oil & Refining Company, unlawfully entered upon said land and ejected him therefrom and withholds from him the possession thereof, to his damage $50,000. He also alleged that appellant had drilled several oil wells on said land and was producing large quantities of oil therefrom, and pray-

ed for the appointment of a receiver of said property, and for partition.

Appellant answered by general demurrer, and a plea of not guilty directed to the suit in trespass to try title, and also pleaded improvements in good faith. It answered the suit for appointment of a receiver by general demurrer, general denial, and special answer.

The state by leave of the court intervened, and, among other things, alleged that the oil lease from Humberto Trevino to appellee E. G. Lloyd, Jr., was at all times and then was a valid and enforceable oil and gas lease on the undivided one-half interest in and to the land involved; that appellant, Humble Oil & Refining Company, being the owner by assignment of the oil and gas lease executed by Mucio Vela and his wife, Dionicia Vela, which covered the whole of said section 42 of land containing 640 acres, was claiming to own all of the oil and gas in the north ½ of said section, but that it had only an undivided ½ interest therein, the said E. G. Lloyd, Jr., being the owner of the other undivided ½ thereof, and prayed that E. G. Lloyd, Jr., be decreed to be the owner "of the oil and gas lease on an undivided one-half interest in and to the north one-half of the aforesaid section." The prayer did not seek judgment for the state in any way to any alleged interest in the property involved.

By leave of the court, Humberto Trevino also intervened, his intervention plea setting up practically the same fact allegations as did that of the state of Texas, intervener, and prayed for the same relief—the establishment of the E. G. Lloyd, Jr., lease as valid.

Appellant answered these pleas of intervention by general demurrer, general denial, plea of not guilty, and specially pleaded the facts which it contended constituted Mucio Vela (under whom it claims by virtue of the lease from Mucio Vela and wife of February 10, 1925, to Phillip T. Wright, covering the whole of section 42) "the owner of the soil," and therefore the agent of the state at the time he executed the Wright lease under which appellant claimed. It further specially pleaded estoppel against Humberto Trevino denying that full title to the oil, gas, and mineral estate in the land passed by Mucio Vela's lease of February 10, 1925, such estoppel arising by virtue of the fact that if the whole mineral estate did not pass by Mucio

Vela's lease, nevertheless, the outstanding interest, if any, subsequently vested in J. O. Trevino, and J. O. Trevino recognized, ratified, and confirmed, of record, appellant's lease prior in time to his attempt to carve from the merged estate a one-half interest, to the prejudice of appellant, by his conveyance to his son Humberto Trevino.

Appellant also impleaded J. O. Trevino and his wife, Gregorio Trevino, in the suit by statutory plea in trespass to try title. They answered by general demurrer, general denial, and plea of not guilty. By supplemental petition, the state of Texas, and Humberto Trevino pleaded the agency of Humberto Trevino for the state in the making of the mineral lease to E. G. Lloyd, Jr., on an undivided ½ interest in the land involved.

Upon conclusion of the evidence, plaintiff E. G. Lloyd, Jr., abandoned his prayer for partition, and also his plea for the appointment of a receiver. This left before the court only the trespass to try title count for adjudication.

The case was tried to the court without a jury, and judgment rendered granting to plaintiff E. G. Lloyd, Jr., interveners state of Texas and Humberto Trevino, and cross-defendants J. O. Trevino and wife, Gregorio Trevino, the relief for which they prayed, to wit, the validation of the lease from Humberto Trevino to E. G. Lloyd, Jr., and the recovery of a ½ undivided interest in and to the oil, gas, and mineral estate in the land involved. The judgment denied recovery on appellant's cross-action against E. G. Lloyd, Jr., Humberto Trevino, J. O. Trevino, and his wife, Gregorio Trevino, except as to a ½ undivided interest in and to the mineral leasehold estate, which it was conceded passed by virtue of the lease from Mucio Vela to Phillip T. Wright dated February 10, 1925, and passed by mesne conveyances to appellant. Recovery was granted appellant on its plea of improvements in good faith, and the judgment provided for retention by it of the value of oil taken in the future from the land until it was reimbursed in full for all sums expended in making such improvements. We have the case for review.

The contest here is whether the oil, gas, and mineral lease executed by Mucio Vela and his wife, Dionicia Vela, February 10, 1925, to Phillip T. Wright (under which appellant claims) covering the whole of

section 42—640 acres—said lease executed by Vela as owner of the soil for himself individually and as agent for the state, was valid and binding as affecting the whole section; or whether the lease executed by Humberto Trevino, as the owner of the undivided ½ interest of Santiago, Cruz, and Jose Jesus Vela, the three children of Mucio Vela and his wife, Candelaria Vela, deceased, which they inherited from their mother, said 640 acres of land being the community property of Mucio and Candelaria Vela, their parents, conveyed a valid and enforceable title to an undivided one-half of the oil and gas mineral estate in the north one-half of said section of land.

This question will be determined by the construction to be placed, under the facts stated supra, upon the term "owner of the soil," as that term is used in article 5367, Rev.St.1925, which reads:

"Art. 5367. *School and Asylum Lands.*— The State hereby constitutes the owner of the soil its agent for the purposes herein named, and in consideration therefor, relinquishes and vests in the owner of the soil an undivided fifteen-sixteenths of all oil and gas which has been undeveloped and the value of the same that may be upon and within the surveyed and unsurveyed public free school land and asylum lands and portions of such surveys sold with a mineral classification or mineral reservation, subject to the terms of this law. The remaining undivided portion of said oil and gas and its value is hereby reserved for the use of and benefit of the public school fund and the several asylum funds."

Article 5368 authorizes the owner of the land (the soil) to sell or lease the oil and gas that may be in said land upon such terms and conditions as he may deem best, subject only to the provisions of said law. It further provided that such sales and leases were assignable.

■ Mucio Vela became the "owner of the soil" by his purchase of the land from the state on June 17, 1908. It was acquired while his first wife, Candelaria Vela, was living and so was community property. Under the law, the title to the minerals in the land never passed to Mucio Vela but were reserved to the state. It is the well-settled law of this state that the surface owner (owner of the soil) of school lands, the minerals in which have been reserved to the state, is vested with no ownership, title, interest, or claim in or to the minerals in said land. He is merely the agent through whom the state acts in leasing the mineral estate in the lands for the purpose of exploration and development. The full title to the mineral estate remains in the state. This being true, it must follow that neither Mucio Vela nor Candelaria Vela, his wife, were ever at any time vested with any title to the minerals or any portion of them in the land here involved. The estate of Mucio Vela and his wife, Candelaria, was a community estate in the surface or soil of the land. When she died, her ½ interest in the community estate in the land (surface estate) passed to her three children mentioned supra. She never having been vested with any ownership or title in or to the minerals, upon her death on July 13, 1919, no title in or to the minerals passed from her to her children. After her death, as before, the state of Texas was the sole owner of the severed mineral estate. Her death wrought no change in the title to the mineral estate in the community land.

■ Now, with title to and ownership of the minerals remaining unchanged by her death, what, if any, change occurred regarding the statutory agency created by law for the purpose of facilitating the leasing of the mineral estate for development and sale of oil? The statute, article 5367, answers: The "owner of the soil." Mucio Vela, the owner of the soil, was the medium through which the state must have acted prior to her death; and the "owner of the soil," by force of the statute, of necessity remained such medium after her death.

The determining question here is who was the "owner of the soil" after the death of Mucio Vela's wife, Candelaria Vela?

Undoubtedly Mucio Vela was "the owner of the soil" at all times during the life of his first wife, Candelaria Vela, and as such agent for the state to lease such land. The surface estate in the land was the community property of Mucio Vela and his said wife. As the head of the community, such agency was vested in him solely as the contract purchaser of the land from the state prior to her death, and, we think, as such community survivor after her death. Accordingly, Mucio Vela was the "owner of the soil" as that term is used in articles 5367 and 5368, Rev.St. 1925, when on February 10, 1925, he executed the lease to Phillip T. Wright covering the whole of section 42; and as "the owner of the soil," by such lease he passed

to Phillip T. Wright, and to appellant by mesne conveyances, the full mineral leasehold estate, in the capacity of statutory agent of the state of Texas, in whom all title to such minerals had been reserved by law. Sheldon v. Robison, 117 Tex. 537, 8 S.W.(2d) 662; Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S.W.(2d) 265.

The case of Sheldon v. Robison, supra, was an original mandamus proceeding before the Supreme Court. The surface of the land had been, as in the case at bar, sold with a "mineral" classification. The minerals there as here had been fully reserved to the state. The purchaser, one Rube Holmes, then sold to J. H. Tippett, who succeeded to all of the rights and title held by Holmes, the original purchaser. Subsequent to the purchase of the land by Tippett, as in the instant case, his wife died, and thereafter, "acting individually and as survivor in community of the estate of Laura Tippett, deceased, and as agent of the State of Texas," Tippett leased the land to Roxana Petroleum Corporation. There, as in the case at bar, the lessee expended large sums of money in developing the land. After the land was proved to be oil producing, Sheldon applied to the commissioner of the general land office for a lease upon the land. The commissioner refused the application on the ground that the land being sold as school land, the owner of the surface was the only person authorized to execute a lease. The Supreme Court upheld the land commissioner's position, thereby upholding in all respects the validity of the lease executed by Tippett, acting individually and as community survivor for the estate of his deceased wife.

In Empire Gas & Fuel Co. v. State, supra, the Supreme Court reiterated its holding in Sheldon v. Robison, that a lease executed by the husband, the owner of the soil, by reason of his original purchase of the land from the state, acting individually and as community survivor for the estate of his deceased wife, was in all respects valid.

The lease of February 10, 1925, from Mucio Vela to Phillip T. Wright, was not signed by Mucio as community survivor of the estate of his deceased wife, Candelaria Vela. It is not believed that this was necessary or material. Kane v. Sholars, 41 Tex.Civ.App. 154, 90 S.W. 937. In law, he was the community survivor, and his acts relating to the community estate of himself and his deceased wife will, as a matter of law, be imputed to the community. We think it obvious that when Mucio Vela's application to purchase the land (section 42) was accepted by the state, and the land was awarded to him, that his status of "owner of the soil" ensued, and that he thus became the sole agent of the state to lease the land. The death of his wife did not change or modify this status and he remained, as before, the agent of the state for the purpose of leasing the land. Only one payment (the initial) had been made on the land, and at the time Mucio executed the lease, February 10, 1925, the balance of the purchase price for the land was unpaid, and many of the payments past due. There were also interest and taxes due and unpaid. The land was the community property of Mucio and his first wife, and these debts were due and owing by the community estate. As head of the community, and as community survivor of the estate of his dead wife, he had the lawful right to manage and dispose of the community property for the purpose of paying the community debts. Stone v. Jackson, 109 Tex. 385, 210 S.W. 953. Later, April 13, 1932, Mucio Vela, still owing the state all of the purchase price of the land, together with certain interest and past-due taxes, and realizing that he could not pay same, conveyed said land to J. O. Trevino for the consideration, among others, that Trevino would pay to the state all the obligations of Mucio Vela relative to said land, which were debts of the community of himself and his deceased wife. On February 10, 1925, the date of the lease from Mucio Vela to Phillip T. Wright, the three children of Candelaria Vela, Mucio Vela's deceased wife, were all minors. The estate in the land that they inherited from their mother was charged with the payment of the community debts. They had no control or management of the community estate, but same was by law in their father, Mucio Vela. Such being the case, and they being without the power of control, they did not have the power to alienate the property, it is not believed they could have the status of "owners of the soil," in contemplation of law, and hence did not and could not stand in the position of agents of the state for the purpose of leasing the land. This being true, Mucio Vela, the survivor in community, was the only person clothed with statutory agency with power to lease the land involved. A contrary holding

would retard rather than facilitate the purpose of the statutes, the leasing of the oil rights to the subsurface of sold school land, and run contrary to the declared policy of the law. Greene **v.** Robison, 117 Tex. 516, 8 S.W.(2d) 655.

Furthermore, a careful inspection of the state's petition in intervention discloses that the state by seeking to affirm the lease of appellee E. G. Lloyd, Jr., does not attack the agency of Mucio Vela to lease the land, or seek to repudiate the lease by him executed to Phillip T. Wright on February 10, 1925, nor to avoid same; but the effect of such pleading is to assert that at such time he was but half an agent, that is he was an agent, but could affect but ½ of the land by his lease. The fallacy of this position, we think, is that it fails to consider the right of management and control with which Mucio Vela was vested by law in relation to the community half of the property involved. The state admits that Mucio Vela was clothed by statute with an agency as to his ½, but denies that he had such agency as to the other ½ inherited by the three children from their mother, the deceased wife of Mucio Vela. In the first place, we do not think that the death of Mucio Vela's wife worked any change in the agency created by statute, but that Vela remained the lone agent of the state to lease, as before her death; and, secondly, the community debts owing by the estate of Mucio Vela and his wife, at the time of her death, rested as an obligation upon and over the whole of the community estate, and that Mucio Vela as the community survivor, under the well-established law, had the right and power to sell any or all of the community estate to pay such debts, and so his lease made as such survivor was in all things valid. It seems to us that as Mucio Vela, as community survivor, had the power to sell the whole of the community estate to pay valid and subsisting debts, that it must follow that he, as such community survivor, in contemplation of law, was empowered and authorized to act as such agent of the state in executing the lease of February 10, 1925, to Phillip T. Wright, and that such lease passed a valid and binding leasehold estate to the whole of the land in question.

From what we have said, it follows that the judgment of the trial court should be reversed and that judgment for appellant Humble Oil & Refining Company be here rendered, and it is so ordered.

Reversed and rendered.